**SIGNED THIS: October 08, 2009**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HOOD, MAYA L. | ) | Case No. 08-81539 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| RENETTA WATTS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 08-8109 |
| | ) | |
| MAYA L. HOOD, | ) | |
| Defendant. | ) | |

### O P I N I O N

This matter is before the Court after trial on the complaint filed by Renetta Watts, the Plaintiff (PLAINTIFF), against Maya Hood, the Debtor (DEBTOR), seeking a determination of nondischargeability under Section 523(a)(2)(A) with respect to a debt arising out of a contract for the sale of the residential real estate commonly known as 2411 W. Millman, Peoria (the "Millman Street Property").

At least as far back as 1998, the DEBTOR owned the Millman Street Property, improved with a single-family residence, and operated it as rental or investment property. On October 5, 1998, the DEBTOR signed a promissory note for $27,550, providing for interest at the rate of 6.75%, monthly payments of $178.69, and a maturity date of November 1, 2028, granting a 30-year mortgage on the Millman Street Property to First Financial Bank, to secure the note.[1] The note provided for a late charge for payments made after the fifteenth of the month in the amount of 5% of the overdue payment of principal and interest.

In early 2004, the DEBTOR agreed to sell the Millman Street Property to the PLAINTIFF. The contract, prepared by the DEBTOR, provided for a total purchase price of $33,000, to be paid over 60 months, with $30,000 to be paid in monthly installments of $500 and a separate "down payment" of $3,000 to be paid in installments of $50 each month.[2] The contract does not contain a time of the essence clause, an acceleration clause or a forfeiture clause. The contract makes no mention of the mortgage on the property. The PLAINTIFF moved into the property in February, 2004, and began making monthly payments to the DEBTOR who in turn used a portion of the payments received to make her mortgage payments.

In August of 2007, considering the PLAINTIFF to be in default, the DEBTOR commenced a forcible entry and detainer suit. After being advised by the state court judge that the remedy sought was not appropriate given the total amount paid by the PLAINTIFF under the contract, the DEBTOR initiated a foreclosure action in October, 2007.

---

[1] The note and mortgage are attached to the motion for relief from stay which was filed by Associated Bank in the main case proceedings on June 23, 2008.

[2] The DEBTOR, never having sold real estate before, doctored up a lease form by including a paragraph for the sale of the property to the PLAINTIFF. Most of the standard lease provisions were retained. Though it contains the minimal requisites for a contract for deed, it is a clumsy document which leaves much to be desired.

2

The PLAINTIFF filed an answer to the complaint on December 5, 2007, in which she denied being in default. The DEBTOR voluntarily dismissed the foreclosure complaint on June 24, 2008, shortly after bankruptcy.

The DEBTOR filed a Chapter 7 petition on June 10, 2008. The DEBTOR scheduled the Millman Street Property as having a value of $25,000 and listed the mortgage balance owed to Associated Bank as $23,000. In addition to that property, the DEBTOR owns her home, valued at $89,000 and subject to a mortgage of $74,000. The DEBTOR also scheduled rental property at 1710 N. Valley, Peoria, listed as having a value of $35,000 and subject to a mortgage in that same amount. The PLAINTIFF was scheduled as holding a claim in an unknown amount for an alleged breach of a contract for deed. The DEBTOR listed monthly income of $3,225 and monthly expenses of $3,194. According to her Statement of Intention, the DEBTOR proposed to surrender the Millman Street Property to the mortgagee.

Associated Bank moved for relief from the stay, alleging that the DEBTOR was in default for the month of June in the amount of $275.11, plus late charges, attorney fees of $650 and costs of $150, that the mortgage balance was at least $23,808.78, and that the property was worth less than $23,000. Without objection, the motion was granted and an order was entered modifying the automatic stay to permit Associated Bank to foreclose.

The complaint to foreclose the mortgage on the Millman Street Property was filed in the Peoria County Circuit Court on September 25, 2008.[3] A judgment of foreclosure was entered on November 17, 2008, in the amount of $26,691.78. Following expiration of the redemption period, the Millman Street Property was sold at foreclosure sale to the plaintiff

---

[3] The complaint names the Illinois Housing Development Authority as the plaintiff, presumably because that entity agreed to guaranty all or part of the mortgage debt. The Court takes judicial notice of the contents of the state court file as a matter of public record.

3

for the bid price of $21,600. The PLAINTIFF did not appear in and was not named as a defendant in the foreclosure action, presumably because the contract for deed was never recorded.[4]

The foreclosure complaint names Citifinancial Services, Inc., as a defendant holding a second mortgage on the Millman Street Property, alleging that the DEBTOR granted the mortgage on May 24, 2001, to secure a loan in the amount of $5,292.59. In her bankruptcy schedules, the DEBTOR did not schedule Citifinancial Services, Inc., as a secured creditor. She listed "Citifinancial" on her schedule of unsecured creditors holding a claim in the amount of $2,186. Because the DEBTOR'S bankruptcy case was processed as a no asset case, no proofs of claim were filed. At trial, the DEBTOR was not questioned about the second mortgage.

The PLAINTIFF filed this adversary proceeding, seeking a determination of nondischargeability under Section 523(a)(2)(A), alleging that the DEBTOR falsely represented to the PLAINTIFF that she was making the mortgage payments on the Millman Street Property and the payments were current during the term of the contract for deed. The DEBTOR maintains that she made the payments on the mortgage and that it was the PLAINTIFF who missed and shorted several payments under the contract for deed. The matter was tried on June 23, 2009. The DEBTOR and the PLAINTIFF were the only witnesses.

At trial, the PLAINTIFF contended that the DEBTOR committed fraud because she could not comply with the contract by delivering clear title and continued to take payments

---

[4] The failure to record the contract is of no consequence in this adversary proceeding. Associated Bank obtained unopposed relief from the stay and foreclosed its first mortgage. The foreclosure action, not the bankruptcy proceeding, resulted in the loss of the PLAINTIFF'S and the DEBTOR'S interests in the Millman Street Property.

4

Case 08-08109    Doc 23    Filed 10/08/09    Entered 10/08/09 16:48:45    Desc Main
Document      Page 5 of 16

from the PLAINTIFF up until she filed bankruptcy, including a payment made on or the day before the petition was filed. The DEBTOR, claiming that it was the PLAINTIFF'S default which necessitated the filing of her Chapter 7 petition, contends that she had time remaining under her contract with the PLAINTIFF within which she could have removed the mortgage on the property, perhaps by refinancing. The DEBTOR contends that at the time she filed bankruptcy she was not in default on the mortgage and cannot be penalized for exercising her right to surrender the real estate.

The PLAINTIFF testified that she moved into the Millman Street Property in February of 2004. Because she was paid by her employer twice a month, she testified that the DEBTOR agreed that she could make a portion of the contract payment each time she was paid. The first payment was routinely made on the 4th or the 5th day of the month, in the amount of $300 or more. When she received her second check, she would include the additional $50 payment on the down payment and pay the balance remaining. She testified that in 2004, on a couple of occasions, she was a few days late in making her payments, but that she called the DEBTOR to advise her and she did not object. Subsequent to that date, she failed to make a few payments on time, but she testified that she never missed a payment and was never more than three or four days late in making the payments.

The PLAINTIFF testified that in August, 2007, without having received a notice of default, the DEBTOR told the PLAINTIFF that she "needed to get someone else in the house." The DEBTOR brought a forcible entry and detainer suit which was dismissed when the DEBTOR advised the state court that the PLAINTIFF had paid $23,000. The PLAINTIFF testified that she continued to make payments under the contract. In October,

5

2007, the DEBTOR filed the complaint to foreclose the contract, alleging and incorrectly assuming a nonexistent right of acceleration, that the PLAINTIFF was in default in the amount of $3,375 and that the principal balance due under the contract was $8,777.

The PLAINTIFF introduced into evidence a series of form receipts which she had been given by the DEBTOR. Although she was missing a few receipts, she testified that she never missed a single payment and that the DEBTOR never sought to collect a late charge. The PLAINTIFF testified that she would have paid the late fees if she would have been told that they were due.

At the time the PLAINTIFF entered into the contract, she was aware that the DEBTOR had a mortgage on the property. She testified that it was her understanding that the full amount of her payments would be applied to the DEBTOR'S mortgage and that she would receive clear title to the property when the contract was completed.[5] Neither the PLAINTIFF nor the DEBTOR recorded the contract for deed.

The DEBTOR testified that although she initially agreed that the PLAINTIFF could make the payments in two installments, the PLAINTIFF'S payments became increasingly late. She prepared and presented the PLAINTIFF with a written notice that if she did not begin to make the split payments on time, she would be required to make the full payment on the first of the month, as required by the Agreement.[6] The DEBTOR advised the

---

[5] The PLAINTIFF testified that although the agreement called for her to maintain renter's insurance, she did not obtain insurance because her possessions were of little value. When she advised the DEBTOR of her intention, the DEBTOR told her that she was maintaining insurance on the house because it was in her name and that the PLAINTIFF could obtain the renter's insurance at a later time. The issue of renter's insurance is not helpful to the DEBTOR. Even if the PLAINTIFF'S failure to obtain renter's insurance could be considered to be a "default," it is not material since renter's insurance would protect only the PLAINTIFF'S interest in her own personal property.

[6] The DEBTOR admitted into evidence a document dated November 24, 2006, which provided that beginning on January 1, 2007, the payment would become due on the first of the month with a late charge of $30.00 to be imposed if the payments were not received by the fifth of the month. The document provided:

6

PLAINTIFF that she would continue to accept the split payments only if the PLAINTIFF would agree to pay the late charge. The DEBTOR explained to the PLAINTIFF that she would incur a late fee on her mortgage on the property if the payment was not made by the 15th day of the month. The PLAINTIFF refused to sign the document. According to the DEBTOR, the PLAINTIFF paid only a single late charge and continued to make split payments, which she continued to accept.

The DEBTOR also submitted copies of the rent receipts which she had issued to the PLAINTIFF. She denied that any receipts were missing.[7] According to the DEBTOR'S calculations, at the time the petition was filed the amount due under the contract was $9,863, consisting of the balance due under the contract of $6,700, the remaining amount due on the down payment of $1,300; late fees of $780; payment shortages of $950; and court fees of $133.

The DEBTOR testified that she made all of her mortgage payments until she filed bankruptcy on June 10, 2008, occasionally making extra payments. In her mind, she "messed up" by not charging the PLAINTIFF interest. She testified that she would have continued to make her mortgage payments after the PLAINTIFF completed her contract payments. She testified that she would have conveyed title, subject to the mortgage, to the

---

>   Lessee and Lessor verbally agreed on splitting rents monthly; therefor $300.00 shall be paid on the first of every month. The other half of rent which is $250.00 shall be paid on the 15th of every month, which also shall be paid within five days of the due date. Since the Lessee is splitting rents on the property, the late charge will be split. Late payments are due at the time of payment.
>
>   After the 3rd late payment in 2007 the verbal agreement will be no longer. All rents due will have to be paid in full on the first of each month with a five day grace period. If after the fifth day there will be the full $30.00 late fee.

The DEBTOR was not certain whether that document was the one which she presented to the PLAINTIFF, although she indicated that the terms set forth were those which she sought to impose.

[7]The DEBTOR also used the receipt book for payments made by the lessee/contract purchaser on her other property.

7

PLAINTIFF after she completed her payments, and that she would have continued to make the payments on the mortgage. As she put it, "We trusted each other - we could have worked it out - I still owe but you will have your title."

**ANALYSIS**

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Matter of Scarlata*, 979 F.2d 521 (7th Cir. 1992). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To further the policy of providing a debtor a fresh start in bankruptcy, exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994).

Section 523(a)(2)(A) of the Bankruptcy Code provides as follows:

> (a) a discharge under section 727 . . . does not discharge an individual debtor from any debt–
> * * *
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by-
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

The PLAINTIFF'S theory can be summarized as follows. When the DEBTOR entered into the contract for deed, she incurred an obligation to convey to the PLAINTIFF title to the Millman Street Property free of all liens, contingent upon the PLAINTIFF fulfilling her payment obligations under the contract. The DEBTOR'S obligation is a "debt" for "property" under Section 523(a)(2). The debt was incurred by "false pretenses, a false representation, or actual fraud," because the DEBTOR made a promise to convey clear title

she knew she could not keep or that she did not intend to keep, given the 30-year mortgage to First Financial Bank. The PLAINTIFF'S theory is a valid one. A promise made with a positive intent not to perform, or without a present intent to perform, satisfies Section 523(a)(2)(A). *In re Rubin,* 875 F.2d 755, 759 (9th Cir. 1989). A party who agrees to convey clear title to real estate without a present intent to do so, may be guilty of fraud.

Actual fraud, as defined by the Seventh Circuit Court of Appeals is not limited to misrepresentation, but is broadly defined to include "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another[.]" *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). A claim for actual fraud asserted under this provision requires a creditor to allege that (1) a fraud occurred; (2) the debtor was guilty of intent to defraud; and (3) the fraud gave rise to the debt that is the subject of the discharge dispute. *In re Broholm*, 310 B.R. 864, 875 (Banrk.N.D.Ill. 2004) (citing *McClellan*).

While merely failing to perform a contract does not constitute fraud, a contract entered into or a promise made without the intention to perform may support a determination of nondischargeability. *In re Mathis,* 360 B.R. 662 (Bankr.C.D.Ill. 2006); *In re Bowles*, 318 B.R. 129, 144 (Bankr.E.D.Wis. 2004). The inquiry must focus on the defendant's state of mind at the time the promise was made. If at the time a promise is made, the maker honestly intends to keep it but later changes his mind or fails or refuses to fulfill the promise, there has been no misrepresentation, even if there is no excuse for the subsequent breach. *Palmacci v. Umpierrez,* 121 F.3d 781, 787 (1st Cir. 1997). A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions. *Id.* Courts must

guard against allowing a simple breach of contract to rise to the level fraud by inferring from the fact of nonperformance that the promisor never intended to perform. *Milwaukee Auction Galleries, Ltd. v. Chalk,* 13 F.3d 1107, 1109 (7th Cir. 1994). Nonperformance alone is not enough to ground such an inference; there must be additional evidence of the defendant's intentions at the time the promise was made. *Id.*

The DEBTOR denied that she intended to deceive the PLAINTIFF. While a creditor must establish that the debtor acted with intent to deceive, *In re Howard,* 339 B.R. 913 (Bankr.N.D.Ill. 2006), a debtor's admission of such an intent is extremely rare. *In re Young,* 91 F.3d 1367 (10th Cir. 1996); *In re Radcliffe,* 317 B.R. 581 (Bankr.D.Conn. 2004). It is well established that an intent to deceive may be demonstrated through circumstantial evidence and inferred from the totality of the evidence presented. *Young,* 91 F.3d at 1375.

When the DEBTOR executed the mortgage on the Millman Street Property, the total amount of the payments which she was to make over the 30-year term was $64,328.40. Assuming that the DEBTOR was current on her mortgage payments at the time she entered into the contract for deed with the PLAINTIFF slightly more than five years later, the sum total of the payments (principal and interest) yet to be made under the mortgage was approximately $52,892. At that time, again assuming that the DEBTOR had made all of the payments called for by the mortgage, the principal balance was $25,729. By the Court's calculations, if the DEBTOR had applied the PLAINTIFF'S full monthly payment of $550 to her mortgage beginning with the first payment, her mortgage would have been paid off in August, 2008, just two months after the filing of the bankruptcy petition, and five months before the contract for deed was to be paid off.[8]

---

[8]For purposes of this analysis, the Court is ignoring the second mortgage to Citifinancial Services, Inc., since no evidence was presented about it at trial and it is possible the DEBTOR was paying it from other funding sources.

So the DEBTOR could have put herself in the position of being able to satisfy her contractual obligation to convey clear title, but she needed to pay the full $550 received each month from the PLAINTIFF toward the first mortgage. According to the evidence at trial, she did not do so. Instead, she paid only her scheduled mortgage payment of $228.18, keeping and using the difference of $321.82 for other purposes.

The DEBTOR'S failure to pay the full $550 toward the mortgage is circumstantial evidence that she never intended to comply with her obligation to convey clear title to the PLAINTIFF. Additional corroboration is found in the fact that her financial circumstances were such that she had no other way to pay off the mortgage. The DEBTOR admitted that she could not have the mortgage paid off by 2010 but that she hoped to "talk" to the PLAINTIFF about it, suggesting that she could convey title subject to the mortgage and could continue to pay it off according to its terms over the next eighteen years or so.

Neither is there any evidentiary support for the notion (not argued by the DEBTOR) that she had a present intent to fulfill her contractual promise when she made it and only later, through a change in circumstances, was she unable to comply. If the DEBTOR had paid the full $550 toward the mortgage beginning with the first contract payment in February, 2004, and for some period of time thereafter, that hypothetical circumstance would have evidenced a good faith intent to fulfill her promise. The fact that she did not use the available funds for that purpose, supports the contrary inference, that she made a promise that she never intended to fulfill.[9]

---

[9] Attempting to negate culpability, the DEBTOR asserts that the contract did not require her to apply the full amount of PLAINTIFF'S payments to her mortgage. The Section 523(a)(2)(A) claim does not sound in contract and that assertion, while true, is beside the point. It is no defense to a claim of fraud that the contract did not expressly prohibit the conduct that facilitated and evidenced the fraud.

11

As discussed above, the DEBTOR intended to induce the PLAINTIFF to rely on the false pretense that she would be in a position to convey title at the time the PLAINTIFF tendered her last payment. The Court does not accept the DEBTOR'S testimony that she believed that the real estate would belong to the PLAINTIFF after she completed making the payments under the Agreement and the mortgage would remain her responsibility. Her professed belief that she and the PLAINTIFF could "work something out" is disingenuous.

The PLAINTIFF must also establish justifiable reliance on the part of the DEBTOR. A creditor's reliance on a false pretense or false representation must be justifiable. *Field v. Mans*, 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance only requires that the creditor did not "blindly rely upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination of investigation." The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is easily detectable. *In re Dobek*, 278 B.R. 496, 508 (Bankr.N.D.Ill. 2002). It is not an objective standard, but is based upon the qualities and characteristics of the particular plaintiff and the circumstances of the particular case. *Field*, 516 U.S. at 71, 116 S.Ct. at 444.

Considering all of the circumstances, the Court finds the PLAINTIFF'S reliance to be justifiable. To begin with, the DEBTOR testified that her relationship with the PLAINTIFF was one of trust. While both the PLAINTIFF and the DEBTOR were unsophisticated, the DEBTOR had prior experience in purchasing, mortgaging and leasing real estate. It is entirely reasonable for a lay person, like the PLAINTIFF, to believe that

payments which were made on an agreement for deed, to the extent necessary to discharge an existing mortgage, would be so applied. She had no reason to distrust the DEBTOR.

The PLAINTIFF must also establish a causal nexus between the false pretenses and the debt. *Archer v. Warner*, 538 U.S. 314, 325, 123 S.Ct. 1462, 1470, 155 L.Ed2d 454 (2003). The damages suffered by the PLAINTIFF must be a proximate consequence of the false pretenses having been made. The DEBTOR asserts that the PLAINTIFF'S loss is the result of her default on the contract. At trial, the DEBTOR contended that the PLAINTIFF'S default under the contract was $8,703, consisting of the balance due on the contract payments of $4,200; balance due on the down payment of $1,250; payment due for March of $580; late fees of $1,540; and court costs of $133. In turn, the PLAINTIFF insists that she was in substantial compliance with the contract. In making this claim, the PLAINTIFF contends that the DEBTOR had agreed to the making of the monthly payment in two installments and that she had waived her right to collect late fees under the contract.[10]

It is true that a vendor under a contract for the sale of land may waive a right to forfeiture by acceptance of late payments. *Tadros v. Kuzmak*, 277 Ill.App.3d 301, 660 N.E. 2d 162 (Ill. App. 1 Dist. 1995). To reestablish strict compliance, the vendee must be notified in writing of the vendor's intention to rely on the contractual provision of timely payment and be given a reasonable time to comply. *City of Chicago v. Chicago Title and Trust Co.*, 205 Ill.App.3d 728, 563 N.E.2d 65 (Ill.App. 1 Dist. 1990). According to the DEBTOR'S testimony, around the time the PLAINTIFF filed her answer to the foreclosure complaint, she gave written notice to the PLAINTIFF that she would require compliance with the

---

[10]The DEBTOR relies upon the integration clause in the Agreement, which provided that it constituted the entire agreement between the parties, to preclude consideration of the DEBTOR'S testimony of her agreement with the PLAINTIFF regarding the making of the payments in installments. The DEBTOR'S own testimony, however, established her consent to this practice.

13

terms of the contract unless the PLAINTIFF agreed to pay half the late charge if either of the two split payments was not paid by the 6th and 21st of each month.

The record reveals that the DEBTOR thereafter continued to accept payments from the PLAINTIFF without imposing any late fee. The receipts submitted into evidence by the DEBTOR show that the balance due under the Agreement on December 17, 2007, when the PLAINTIFF made a payment of $500, was $6,700, and after application of the payment the balance was $6,200. On January 16, 2008, after the PLAINTIFF made a payment of $500 on January 16, 2008, the balance was reduced to $5,700. Similarly, after crediting the payment of $500 made by PLAINTIFF on February 14, 2008, the balance is shown as $5,200. The DEBTOR'S notice, if in fact given to the PLAINTIFF, was not enforced by the DEBTOR and is given no effect by the Court.

At trial, the evidence regarding the balance due under the Agreement was conflicting. The DEBTOR, apparently erroneously assuming a right of acceleration, contended that the amount of the default under the Agreement was $7,943 consisting of the principal balance of $3,200; balance remaining on the down payment of $1,000; late fees of $1,660; missed payments of $950; attorney's fees of $1,000 and court fees of $133.[11] The PLAINTIFF denied missing any payments. After carefully observing the witnesses at trial, the Court concludes that the PLAINTIFF'S testimony was more credible and is corroborated on this point by the payment receipts.

Moreover, the receipts, written out and signed by the DEBTOR, indicate that the PLAINTIFF was less than one full payment behind as of the bankruptcy filing. From

---

[11]While the paragraph of the Agreement captioned "Miscellaneous" attempts to render PLAINTIFF liable for any attorney fees incurred by the DEBTOR, not only is it worded in terms of "Lessor" and "Lessee," but it stops in mid-sentence, falling short of its intended purpose.

14

February, 2004, through June, 2008, 53 payments came due. So PLAINTIFF should have paid 53 payments of $500 for a total of $26,500, and 53 payments of $50, for a total of $2,650. Receipt No. 745942, dated 6-10-08, states that credit for a $500 payment left a balance of $3,200, meaning PLAINTIFF had actually paid $26,800 so that she was $300 ahead on her $500 payments. Receipt No. 745943, dated 6-10-08, states that credit for a $50 payment left a balance of $1,000, meaning PLAINTIFF was $650 behind on her $50 payments. So on a combined net basis, PLAINTIFF was only $350 behind on her contract payments through June, 2008. She had paid $28,800 out of a total purchase price of $33,000, and was in arrears $350, a minimal delinquency clearly insufficient to support loss of her property interest through foreclosure.[12]

In sum, the Court concludes that the PLAINTIFF has proved by a preponderance of the evidence that the DEBTOR committed fraud by agreeing to convey clear title to the Millman Street Property, in exchange for 60 payments of $550, without a present intent to honor that agreement. While the DEBTOR'S failure to pay the mortgage on the Millman Street Property resulted in a direct loss to the PLAINTIFF, the loss is not equivalent to the full amount of the payments made under the contract by the PLAINTIFF. The DEBTOR'S fraud and failure to pay off the mortgage deprived the PLAINTIFF of the benefit of her bargain. After seven more payments, she would have been entitled to receive title to the Millman Street Property free and clear of all liens. That loss may be quantified based on the value of the real estate. The best evidence of that value is the $21,600 price paid at the foreclosure sale in April, 2009. Deducting the

---

[12] In real estate installment contracts, Illinois follows the doctrine of equitable conversion. Equitable conversion takes place at the instant a valid and enforceable contract is entered into and the buyer at that time acquires an equitable title. The seller continues to hold legal title, but in trust for the buyer. *Shay v. Penrose,* 25 Ill.2d 447, 449-50, 185 N.E.2d 218, 219-20 (1962).

seven unpaid payments totaling $3,850 yields a net loss of $17,750. This loss was proximately caused by DEBTOR'S fraud and judgment will be entered in this amount in favor of the PLAINTIFF.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###